UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES & STATE OF TEXAS *ex rel.* TERRI R. WINNON<br><br>Plaintiffs,<br><br>v.<br><br>RAMIRO LOZANO, *et al.*,<br><br>Defendants. | Civil Case No. 17-2433 (RJL) |

## MEMORANDUM OPINION

(August 4, 2023) [Dkt. #68]

Relator Terri R. Winnon ("Winnon" or "Relator") brought suit on behalf of the United States and the State of Texas under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("False Claims Act" or "FCA"), and the Texas Medicaid Fraud Prevention Law, TEX. HUM. RES. CODE ANN. § 36.011, *et seq.* ("TMFPL"). *See* Relator's Second Am. Compl. ("SAC") [Dkt. #23] ¶ 1. The action is brought against seventeen defendants who have been organized into three groups of defendants. This Memorandum Opinion addresses only the Relator's claims as it relates to one of the groups comprised of six physicians – Miguel A. Molinas, Diana Carubba, Ronaldo Factoriza, Francis Gumbel, Paul A. Lenz, and Javier A. Jover (collectively the "Defendant Physicians").[1]

---

[1] The two other groups of defendants are: first, RehabCare Group East, LLC ("RehabCare"); and second, eight Skilled Nursing Facility ("SNF") entities ("Defendant Facilities"), Ramiro Lozano ("Lozano"), and Jay W. Balentine ("Balentine"). The eight Defendant Facilities include: RJ Meridian Care Alta Vista, LLC; RJ Meridian Care of Alice, LTD; RJ Meridian Care of Galveston, LLC; RJ Meridian Care of Hebbronville, LTD; RJ Meridian Care of San Antonio, LTD; RJ Meridian Care of San Antonio III, LLC; Spanish Meadows of Katy, LTD; and Empire Spanish Meadows, LTD.

1

Relator alleges the defendants knowingly submitted, or caused to be submitted, false claims to government health care programs, including Medicare and the Texas Medicaid program, and knowingly offered, paid, solicited and/or accepted remunerations in exchange for medical referrals in violation of federal and state laws. *Id.* at ¶ 2. The Defendant Physicians moved to dismiss Relator's SAC. For the following reasons, the Defendant Physicians' Motion to Dismiss is hereby GRANTED.[2]

## I. BACKGROUND

### a. Procedural History

Relator was the Executive Assistant and then Controller for Lozano who, along with Balentine, owned, controlled, and operated a number of health care facilities throughout Texas from January 2009 through at least 2016. *Id.* at ¶¶ 3, 12. The health care facilities included SNFs, assisted living facilities, and independent living facilities. *Id.* at ¶ 3.

Lozano and Balentine owned, controlled, and operated these health care facilities through the eight Defendant Facilities. *Id.* The Defendant Facilities were enrolled as Medicare and Texas Medicaid providers during the relevant time period. *Id.*

After a period of time working for Lozano, Winnon began to notice anomalies with the companies' finances and became concerned about certain practices by Lozano,

---

[2] The Court declines to exercise supplemental (or "pendant") jurisdiction over remaining state claims. *See* 28 U.S.C. § 1367; *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1998) (finding that when all federal claims are eliminated before trial, courts may "declin[e] to exercise jurisdiction over the remaining state-law claims."); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1267 (D.C. Cir.1995).

Balentine, and the Defendant Facilities. *Id.* at ¶ 11. After raising such concerns to Lozano over a period of time, she was terminated. *Id.*

On March 16, 2016, and prior to the November 2017 filing of her complaint in this case, Relator entered into a separation agreement with Spanish Meadows – Meridian Care Companies. *See* Separation of Employment Agreement, Release of Claims & Confidentiality Agreement [Dkt. # 70-1] ("Release"); SAC.[3] The Release provided, in relevant part:

> Terri Winnon … RELEASES, ACQUITS, AND FOREVER DISCHARGES … Spanish Meadows – Meridian Care and all subsidiaries, affiliates, related entities, owners, directors, officers, members, management companies and/or parents thereof, including but not limited to Ramiro G. Lozano and Jay Balentine, and all partnerships, companies, and corporations owned in whole or part by any of the foregoing persons or entities, and all partnerships and corporations related or affiliated therewith or which may become related or affiliated thererto in the future, and the successors, assigns, representatives, employees, agents, directors and officers of the forgoing and their affiliates, directors, officers, agents, insurers, employees, servants, successors, and assigns of the forgoing ("the "Released Parties") from any and all claims, causes of action, suits, demands and liabilities (collectively "Claims") known or unknown, foreseen or unforeseen… including

---

[3] When faced with subject matter jurisdiction questions in a motion to dismiss, "it is well established in this Circuit that a court is not limited to the allegations in the complaint, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case." *U.S. ex rel. El-Amin*, 2007 WL 1302597, at *2 (citing *Alliance for Democracy et al., v. Federal Election Comm'n*, 362 F.Supp.2d 138, 142 (D.D.C. 2005)).

but not limited to all claims under ... the Federal False claims Act, 31 U.S.C. § 3730(h) ...

*Id*. at 3-4.

Winnon filed this action in November 2017, asserting claims for violations of the FCA and the TMFPL. *See* SAC. The United States sought and received from the Court several extensions of time to conduct its own investigation of the facts and to consider whether it would intervene. In February 2022, the United States and the State of Texas noticed their election to decline intervention,[4] and shortly thereafter the Court unsealed relevant portions of the record and directed for the Complaint to be served upon all defendants.[5] In July 2022, the three groups of defendants filed separate Motions to dismiss.[6] In March 2023, the Court granted the Defendants' Motion to Stay Discovery. Minute Order (Mar. 30, 2023).

### b. Summary of Relator's Allegations

As discussed in more detail below, Winnon alleges in her SAC that Winnon, Lozano, and the Defendant Facilities paid remunerations to a number of referral sources through medical directorships and gifts. *See* SAC at ¶ 5. Winnon alleges that the six Defendant Physicians received unlawful remuneration from Empire Spanish Meadows, LTD in

---

[4] *See* Notice of Election to Decline Intervention by United States of America [Dkt. #28] ("Gov't Notice to Decline Intervention").
[5] *See* Order (Feb. 10, 2022) [Dkt. #29].
[6] Def. Miguel A. Molinas, Diana Carubba, Ronaldo Factoriza, Francis Gumbel, Paul A. Lenz, and Javier A. Jover's Mot. to Dismiss Relator's Second Am. Compl. [Dkt. #68] ("Def. Physicians' MTD"); Def. RehabCare Group East, LLC's Mot. to Dismiss Relator's Second Am. Compl. [Dkt. #69]; SNF Def.'s Mot. to Dismiss Second Am. Compl. [Dkt. #70] ("SNFs' MTD").

order to induce referrals of Medicare and Medicaid patients in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), the Physician Self-Referral Law, 42 U.S.C. § 1395nn ("Stark Law"), the TMFPL, the Texas Human Resource Code – Medical Assistance Program, TEX. HUM. RES. CODE ANN. § 32.039(b) ("MAP"), and the Texas Patient Solicitation Act, TEX. OCC. CODE ANN. § 102.011, *et seq.* ("TPSA"). *Id.* at ¶ 6.

Specifically, Winnon alleges that the Defendant Facilities paid certain physicians, including the six Defendant Physicians, as medical directors in an effort to illegally induce patient referrals to the SNFs. *Id.* at ¶¶ 96-98. She also alleges that one of the Defendant Facilities, Empire Spanish Meadows, provided remunerations (in the form of alcohol, meals, etc.) to discharge planners and doctors, including the six Defendant Physicians, as evidenced by Empire Spanish Meadows' own account records. *Id.* at ¶¶ 109-10.

## II. ANALYSIS

The Defendant Physicians argue in their Motion to Dismiss that the Relator's SAC should be dismissed because, iter alia,[7] Relator's severance agreement bars her action and Relator fails to plead fraud with adequate particularity, as required by Rule 9(b).

In addition, the Defendant Physicians contend that the release signed by the Relator bars her from bringing any action against the Defendant Physicians and that this Court

---

[7] Defendant Physicians also argue in their Motion to Dismiss that Relator fails to state a claim for relief under Rule 12(b)(6), Relator's conspiracy claim is conclusory and must be dismissed, and that Relator's state law claims should be dismissed.

5

does not have subject matter jurisdiction over Relator's claims.[8] Relator, however, argues that the release should not be enforced, inter alia, because it is invalid and unenforceable for public policy reasons.[9] Unfortunately for the Relator, the Court finds that while the release does not bar Relator from bringing this action against the Defendant Physicians the Relator doesn't plead fraud against the Defendant Physicians with adequate particularity. How so?

"Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which governs motions to dismiss for lack of subject matter jurisdiction, 'the plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence.'" *Alliance for Democracy v. FEC,* 362 F.Supp.2d at 141–42 (quoting *Pitney Bowes, Inc. v. United States Postal Serv.,* 27 F.Supp.2d 15, 19 (D.D.C.1998)). "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501 (1975) (citing *Jenkins v. McKeithen,* 395 U.S. 411, 421–22 (1969)). "Additionally, in deciding a Rule 12(b)(1) motion, it is well established in this Circuit that a court is not limited to the allegations in the complaint, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case." *Alliance for Democracy,* 362 F.Supp.2d at 142 (citing *Equal Employment*

---

[8] The Defendant Physicians' Motion to Dismiss, Def. Physicians' MTD at 16-17, incorporates by reference the arguments made by Lozano, Balentine, and the Defendant Facilities, SNFs' MTD at 38-42.
[9] Relator's Resp. to Defs. Miguel A. Molinas, Diana Carubba, Ronaldo Factoriza, Francis Gumbel, Paul A. Lenz, and Javier A. Jover's Mot. to Dismiss Relator's Second Am. Compl. at 9-16 [Dkt. #75] ("Relator's Resp. to Def. Physician's MTD.").

*Opportunity Comm'n v. St. Francis Xavier Parochial Sch.,* 326 U.S.App. D.C. 67, 70–71, 117 F .3d 621, 624–25 n. 3 (D.C.Cir.1997) (other citations omitted)).

In order for the Release to bar this action, it must both encompass Relator's *qui tam* claims and the interest of enforcement must outweigh a public policy that would be harmed by the enforcement. *See El-Amin*, 2007 WL 1302597, at *3; *U.S. ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1167-72 (10th Cir. 2009). The Release is unenforceable if "the interest in its enforcement is outweighed in the circumstances by a public policy harmed by the enforcement of the agreement." *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987). Here, the Release is indeed unenforceable because it violates key public policy underpinnings of the False Claims Act.

When considering the enforceability of releases executed prior to the filing of an FCA suit, courts have widely applied the analytical framework established by the Ninth Circuit in *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir. 1995) and *United States ex rel. Hall v. Teledyne Wah Chang Albany*, 104 F.3d 230 (9th Cir. 1997). *See United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 600 F.3d 319, 329-30 (4th Cir. 2010)*; e.g., El-Amin*, 2007 WL 1302597, at *2-6; *Ritchie*, 558 F.3d at 1169; *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16 (2nd Cir. 2016). The Ninth Circuit in *Green* and *Hall* addressed the enforceability of releases entered into before *qui tam* claims are filed and focused on the Government's knowledge of the relator's fraud allegations prior to the suit. *See Green*, 59 F.3d at 963-70; *Hall*, 104 F.3d at 232-34; *see also Purdue* 600 F.3d at 332; *Ritchie*, 558 F.3d at 1170. In *Green*, the Ninth Circuit

7

considered whether a release of a *qui tam* claim is actionable if the release was entered into without the Government's knowledge or consent and prior to the filing of the action. *Green*, 59 F.3d at 956. It concluded that the release would be unenforceable because enforcing the release would "impair a substantial public interest" by nullifying the incentives the FCA gives to file *qui tam* claims. *Id.* at 963.

Then in *Hall*, the Ninth Circuit enforced a pre-filing release in a situation where the Government was "aware of [the relator's] allegations regarding false certification" and had the opportunity to investigate the charges prior to the release. *Hall*, 104 F.3d at 231-33. The Ninth Circuit in *Hall* concluded in that circumstance, "the public interest in having information brought forward that the [G]overnment could not otherwise obtain [was] not implicated." *Id.* at 233. Therefore, "[w]hen the [G]overnment is unaware of potential FCA claims the public interest favoring the use of *qui tam* suits to supplement federal enforcement weighs against enforcing prefiling releases. But when the [G]overnment is aware of the claims, prior to suit having been filed, public policies supporting the private settlement of suits heavily favor enforcement of a prefiling release." *Purdue*, 600 F.3d at 332.

Applying the above articulated framework to the present case, the Release was entered into on March 16, 2016, prior to the November 2017 filing of the Relator's complaint and prior to the Government having knowledge of the charges. The Defendant Physicians argue that the Government had knowledge of the allegations because the Government had already intervened in *United States ex rel. Haplin v. Kindred*

8

*Healthcare, Inc.*, No. 1:11-CV-12139-RGS (D.Mass. filed Dec. 7, 2011) (the "*Halpin* Action"). *See* Def. Physicians' MTD at 16-17; SNFs' MTD at 38-42. However, the *Halpin* Action only involved allegations of therapy upcoding against RehabCare (also known as Kindred Healthcare, Inc.), did not involve any of the six Defendant Physicians, and the allegations in the *Halpin* Action were distinct from the remuneration allegations Relator Winnon alleged against the Defendant Physicians. *See* Complaint, *Halpin* Action. Therefore, the alleged fraud committed by the six Defendant Physicians was not "sufficiently disclosed to the [G]overnment," *Purdue*, 600 F.3d at 332, nor did the Government have sufficient opportunity to conduct an investigation and "evaluate the merits of the suit" against the six Defendant Physicians, *El-Amin*, 2007 WL 1302597, at *7. The heightened pleading standard of Rule 9(b) also generally applies to state law fraud claims brought in federal court. *See Lawton ex rel. United States v. Takeda Pharmaceutical Company, LTD*, 842 F.3d 125, 132 (1st Cir. 2016); *United States ex rel. Foster v. Bristol-Myers Squibb Co.*, 587 F.Supp.2d 805, 827 (E.D. Tex. 2008) (finding that relator's state FCA claims, including the TMFPL, were also subject to the pleading requirements of Rule 9(b)).

As a result, the interests in enforcing the Release are "outweighed in the circumstances by a public policy harmed by the enforcement of the agreement." *Rumery*, 480 U.S. at 392. The public policy considerations at issue in this case are similar to those Judge Penn analyzed in *El-Amin*. *El-Amin*, 2007 WL 1302597, at *6. First, the Court in *El-Amin* noted that the FCA "provides that a *qui tam* complaint can be voluntarily

dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." *Id*. (quotations omitted) (citing 31 U.S.C. § 3730(b)(1); *see also* Gov't Notice to Decline Intervention at 2. Enforcing the release, which was entered into prior to the Government's knowledge about the Defendant Physicians' alleged misconduct, would "effectively sanction settlements without the [G]overnment's consent" and may "encourage relators to settle claims without the [G]overnment's knowledge." *El-Amin*, 2007 WL 1302597, at *6. Additionally, "[e]nforcing a release entered into before the [G]overnment decides to intervene would frustrate the financial incentives designed to encourage relator participation" and could "hinder the government's ability to investigate the matter." *Id*. at *7.[10] As such, the Release here does not bar Relator's claims or deprive this Court of jurisdiction to hear them.[11]

### a. Particularity of Fraud Claims

Defendant Physicians argue that Relator failed to plead fraud with particularity to the standard required by Federal Rule of Civil Procedure 9(b) and contend that the illegal remunerations received by the Defendant Physicians are only implied in invoices and accounting records. Def. Physicians' MTD at 12-15. The Relator maintains that she did adequately plead that the Defendant Physicians participated in an unlawful kickback scheme. Relator's Resp. to Def. Physician's MTD at 4-9. Unfortunately for the Relator,

---

[10] The Government's ultimate decision not to intervene in the case after investigation, *see* Gov't Notice to Decline Intervention, does not dilute or diminish the public policy concerns at issue. The public policy considerations noted above and discussed in *El-Amin* are predicated on the importance of the Government's abilities to learn about the allegations and investigate the matter, which would be frustrated by the enforcement of such a release, regardless of whether or not the Government ultimately decides to intervene.

[11] The Court does not need to reach the issue of whether the release encompasses Relator's claims.

however, the Defendant Physicians have the better argument, and the Court finds that the Relator failed to plead fraud with sufficient particularity. How so?

Rule 9(b) requires Relator to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The heightened pleading standard serves to "discourage[] the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude" and to "guarantee all defendants sufficient information to allow for preparation of a response." *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015). Moreover, the False Claims Act is "self-evidently an anti-fraud statute, [and] complaints brought under it must comply with Rule 9(b)." *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002).

Rule 9(b) does not require a complaint "to contain a detailed allegation of all facts supporting each and every instance of submission of a false claim," *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 35 (D.D.C. 2003), but in order to satisfy Rule 9(b), a plaintiff must allege the "who," "what," "when," and "where" with respect to the circumstances of an alleged fraud. *See United States ex rel. Riedel v. Boston Heart Diagnostics Corporation*, 332 F.Supp.3d 48, 76 (D.D.C. 2018) (citing *Heath*, 791 F.3d at 124).

Relator Winnon's allegations against the six Defendant Physicians here are insufficient to satisfy Rule 9(b)'s particularity standards. Relator contends that the six Defendant Physicians illegally referred patients to the Defendant Facilities in exchange

for "sham" medical directorships and other remunerations from Empire Spanish Meadows in the form of meals, alcohol, and other gifts. *See* SAC at ¶¶ 93-118. According to the Relator, she does not recall ever seeing a written agreement between the facilities and a "medical director" and the medical directors were paid a static monthly rate. *Id.* at ¶¶ 98-99. The Relator alleges such a static payment rate from month-to-month is suspicious because it doesn't account for the amount of work the physicians worked in a particular month. *Id*. The Relator also alleges that Empire Spanish Meadows, one of the Defendant Facilities, provided remunerations (in the form of alcohol, meals, etc.) to discharge planners and doctors, including the six Defendant Physicians, as evidenced by examples from Empire Spanish Meadows' own account records from 2013 to 2015. *Id.* at ¶¶ 109-10.

Although Relator adequately alleges the "who," "where," and "when" requirements of Rule 9(b) by identifying the individuals and corporate entities who allegedly participated in the purported schemes,[12] the locations at which the scheme allegedly occurred,[13] and the relevant time period,[14] the "what" element is not alleged sufficiently because she fails to provide a "detailed identification" of the allegedly fraudulent scheme. *See Riedel*, 332 F.Supp.3d at 78. Instead, a careful reading of the SAC reveals only conclusory allegations of the alleged kickback scheme to provide unlawful remunerations and kickbacks to the six Defendant Physicians in return for unlawful referrals. SAC at ¶¶ 93-

---

[12] *See* SAC at ¶¶ 8-11.
[13] *Id.* at ¶¶ 3, 97-109.
[14] *Id.* at ¶ 3.

118. Although Rule 9(b) does not require the Relator to "identify particular claims resulting from the kickback scheme," Relator fails to "fully explain how the alleged scheme concerning these physicians is supposed to work." *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 665, 674-75 (S.D. Tex. 2013).

Unlike in *United States ex rel. Thomas v. St. Joseph Hospice, LLC*, No. 16-CV-143-KS-MTP, 2019 WL 1271019 (S.D. Miss. 2019), a case involving similar allegations of allegedly fraudulent medical directorships, Relator Winnon did not plead "substantial details of the alleged agreement." In *Thomas*, the Relators made the following specific allegations of the defendants, providers of hospice services: defendants paid their medical directors varying rates based on the volume and value of each physician's referrals; defendants' employees made up fake time entries and compensation sheets that didn't correspond to the actual amount of time the medical directors worked; defendants reduced a medical director's pay when the medical director stopped bringing in referrals; and relators identified specific patients referred to the defendants by specific medical directors in exchange for remuneration as well as the specific dates the patients were admitted. *Id*. at 10. Not surprisingly, the court in *Thomas* held that such allegations are "reliable indications of fraud" and the relators had pleaded "a level of detail that demonstrates that an alleged scheme likely resulted in bills submitted for government payment." *Id.* (quoting *United States ex rel. Nunnally v. West Calcasieu Cameron Hosp.*, 519 Fed.Appx. 890, 893 (5th Cir. 2013)). In the instant case, Relator Winnon's allegations fall far short of the level of specificity pleaded by the relator in *Thomas*.

Relator Winnon's allegations are also unlike the plaintiffs' allegations in *United States ex rel. Kaczmarcyk v. SCCI Health Services Corp.*, No. H-99-1031, 2004 WL 7089810, at *4 (S.D. Tex. March 11, 2004). Although the defendant, a hospital, alleged that the United States' complaint failed to meet Rule 9(b) requirements, the court in *Kaczmarcyk* found that the United States' complaint provided sufficient detail of the alleged scheme. *Id*. at *4-7. In that case, the complaint alleged that the medical directorship agreements were shams because the compensation provided was "in reality, both a reward for the volume of past referrals and an incentive to continue a high number of referrals" and explained that three of the physicians hired as medical directors admitted nearly fifty percent of the defendant hospital's patients during a certain time period. *Id*. at *4-5. The court noted that the Government's complaint also explained why the medical directorships didn't fit within the personal service arrangement exception since the defendant hired more medical directors than was reasonable and necessary, compensated the medical directors at a rate exceeding fair market value for the services they were expected to perform, and took into account past and future referrals in setting the rates. *Id*. at *5. By comparison, Relator Winnon's allegations provide far less detail about the alleged scheme involving the six Defendant Physicians' medical directorships.

Rather, Relator Winnon's allegations are more akin to the original complaint dismissed by the court in *United States ex rel. Emanuele v. Medicor Associates*, No. 10-245 Erie, 2013 WL 3893323, at *8 (W.D. Pa. July 26, 2013). In *Emanuele,* the court found that the relator's original complaint had failed to meet the pleading requirement

because it "[did] not delineate why the medical directorships at issue were not legitimate service contracts, what instructions concerning the service contracts were allegedly given, and whether any specific or even general number of referrals allegedly took place pursuant to the contracts." *Id.* Ultimately, the court in *Emanuele* held that the allegations contained in the original complaint were "conclusory and nonspecific" and dismissed the claims. *Id.*

Relator Winnon's claims against the six Defendant Physicians here fail to provide the types of "detailed identification" of the allegedly fraudulent scheme, *Riedel*, 332 F. Supp. 3d at 78, which "fully explain[s] how the alleged scheme concerning these physicians is supposed to work," *Parikh*, 977 F. Supp. at 674-75, as is required by Rule 9(b). Indeed, Relator's failure to plead fraud with sufficient particularity is especially stark as it relates to defendants Dr. Carubba and Dr. Factoriza who relator does not even contend were paid medical directors of Spanish Meadows.

### III.   CONCLUSION

As such, for all of the foregoing reasons, the Defendant Physicians' Motion to Dismiss must be and is hereby GRANTED.

RICHARD J. LEON
United States District Judge