UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES & STATE OF TEXAS <br> *ex rel.* TERRI R. WINNON, <br><br> Plaintiffs, <br><br> v. <br><br> RAMIRO LOZANO, *et al.*, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Case No. 17-2433 (RJL) <br> ) <br> ) <br> ) <br> ) |

### MEMORANDUM OPINION
(September 15, 2023) [Dkt. #69]

Relator Terri R. Winnon ("Winnon" or "Relator") brought suit on behalf of the United States and the State of Texas under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("False Claims Act" or "FCA"), and the Texas Medicaid Fraud Prevention Law, TEX. HUM. RES. CODE ANN. § 36.011, *et seq.* ("TMFPL"). Relator's Second Am. Compl. ("SAC") [Dkt. #23] ¶ 1. The Relator alleges that the defendants knowingly submitted, or caused to be submitted, false claims to government health care programs, including Medicare and the Texas Medicaid program, and knowingly offered, paid, solicited, and/or accepted remunerations in exchange for medical referrals in violation of federal and state law. *Id.* at ¶ 2. The action is brought against seventeen defendants who have been organized into three groups of defendants. Each of the three groups of defendants has filed a separate Motion to Dismiss. This Memorandum Opinion pertains only to the Motion to Dismiss filed by the RehabCare

1

Group East, LLC ("RehabCare").[1] *See* Defendant RehabCare Group East LLC's Memorandum of Points and Authorities in Support of Motion to Dismiss Relator's Second Amended Complaint ("RehabCare MTD") [Dkt. #69-1]. For the following reasons, RehabCare's Motion to Dismiss is hereby GRANTED.[2]

I.  **Background**

The Relator was the Executive Assistant and then Controller for Ramiro Lozano who, along with Jay W. Balentine, owned, controlled, and operated a number of health care facilities throughout Texas from January 2009 through at least 2016. *See* SAC ¶¶ 3, 12. The health care facilities included Skilled Nursing Facilities ("SNFs"), assisted living facilities, and independent living facilities. *Id.* at ¶ 3.

Lozano and Balentine owned, controlled, and operated these health care facilities through the eight Defendant Facilities. *Id.* The Defendant Facilities were enrolled as Medicare and Texas Medicaid providers during the relevant time period. *Id.* The Defendant Facilities contracted with RehabCare to provide therapy services. *Id.* at ¶ 180.

Medicare Part A reimbursement to SNFs covers medically necessary inpatient therapy services provided during a Medicare beneficiary's covered SNF stay. *See* 42

---

[1] The other two groups of defendants are: first, a group of six physicians – Miguel A. Molinas, Diana Carubba, Ronaldo Factoriza, Francis Gumbel, Paul A. Lenz, and Javier A. Jover (collectively, the "Defendant Physicians"); and second, a group of eight Skilled Nursing Facility ("SNF") entities ("Defendant Facilities") and individuals Ramiro Lozano ("Lozano") and Jay W. Balentine ("Balentine") ("Defendant Owners") (collectively, the "SNF Defendants"). The eight Defendant Facilities include: RJ Meridian Care Alta Vista, LLC; RJ Meridian Care of Alice, LTD; RJ Meridian Care of Galveston, LLC; RJ Meridian Care of Hebbronville, LTD; RJ Meridian Care of San Antonio, LTD; RJ Meridian Care of San Antonio III, LLC; Spanish Meadows of Katy, LTD; and Empire Spanish Meadows, LTD.

[2] Although the SAC asserts claims under Texas state law with respect to the other defendants, the claims against RehabCare are only brought under the federal FCA. *See* SAC ¶¶ 210–255. It is therefore not necessary for the Court to consider whether to exercise supplemental (or "pendant") jurisdiction over any remaining state law claims in ruling on RehabCare's Motion to Dismiss. *See* 28 U.S.C. § 1367(c)(3).

U.S.C. § 1395y(a)(1)(A). During most of the period between 2009 and 2016, SNFs were paid under Medicare Part A for skilled nursing services and therapy services under a prospective payment system according to the calculated daily payment rates. *See* SAC ¶ 127. Under this system, SNFs classified each beneficiary who received skilled nursing services at their facilities into a particular group, known as a resource utilization group, or "RUG," based on the patient's care and resource needs. *Id.* The RUG classification was then used to determine the daily payment rate for each patient beneficiary in the SNF. *Id.* at ¶ 128. Under the RUG classification system—the "RUG-IV System"—there were 66 different payment coding levels for SNF patients, which were divided into several categories, including categories related to therapy. *Id.* at ¶ 130. Under the RUG-IV System, there were five levels of therapy services: (1) Ultra High, which required a minimum of 720 minutes of therapy per week in at least two therapy disciplines; (2) Very High, which required between 500 and 719 minutes of therapy per week; (3) High, which required between 325 and 499 minutes of therapy per week; (4) Medium, which required between 150 and 324 minutes of therapy per week; and (5) Low, which required between 45 and 149 minutes of therapy per week. *Id.* at ¶ 132.

After RehabCare provided therapy services, it billed the relevant Defendant Facility for the services by sending a monthly invoice that listed out all the patients for whom RehabCare provided services, the corresponding "RUG" level for the patient, the number of days the patient needed care at that level, and whether the services qualified as "Ultra High," "Very High," "High," "Medium," or "Low." *Id.* at ¶¶ 180–81. According to the Relator, RehabCare was paid more per patient per day for billing Ultra High and

3

Very High Medicare Part A services than any other level of service, suggesting that RehabCare had a financial incentive to code its services at "Very High" and "Ultra High" rates. *Id.* at ¶ 182. Additionally, the Relator alleges that RehabCare disproportionately invoiced a number of Defendant Facilities, including the Alice Facility, the Hebbronville Facility, and the Galveston Facility, for "Ultra High" and "Very High" therapy levels. *Id.* at ¶¶ 182–96. The costs for the relevant Defendant Facilities were then allegedly passed along to the taxpayers and Medicare when the Defendant Facilities submitted bills to Medicare. *Id.* at ¶ 199.

More information is detailed below, but in December 2011, different relators filed an FCA action against RehabCare (and its then-corporate parent) over allegations related to RehabCare's RUG billing and therapy practices. *See* SAC ¶ 198; *United States ex rel. Halpin v. Kindred Healthcare, Inc.*, No. 1:11-cv-12139-RGS (D. Mass. filed Dec. 7, 2011) (the "*Halpin* Action"); RehabCare MTD at 6–7. In the *Halpin* Action, the Government intervened and ultimately reached a settlement with RehabCare (and its then-corporate parent, Kindred Healthcare, Inc.). *See* RehabCare MTD, Ex. E [Dkt. #69-7]; SAC ¶ 198.

The Relator in the instant case, after a period of time working for Lozano, began to notice anomalies with the companies' finances and became concerned about certain practices by the Defendant Owners and the Defendant Facilities. *See* SAC ¶ 11. After raising such concerns to Lozano over a period of time, she was terminated. *Id.*

Winnon filed this action in November 2017, asserting claims for violations of the FCA and the TMFPL. *See* SAC. The United States sought and received from the Court

4

several extensions of time to conduct its own investigation of the facts and to consider whether it would intervene. In February 2022, the United States and the State of Texas noticed their election to decline intervention,[3] and shortly thereafter the Court unsealed relevant portions of the record and directed for the Complaint to be served upon all defendants.[4] In July 2022, the three groups of defendants filed separate Motions to Dismiss.[5] In March 2023, the Court granted the Defendants' Motion to Stay Discovery.[6]

## II.  Legal Standard

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the allegations contained in the complaint allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the standard does not amount to a "probability requirement," it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient to state a claim. *Id.* When resolving a Rule 12(b)(6) motion, the Court "assumes the truth of all

---

[3] *See* Notice of Election to Decline Intervention by United States of America [Dkt. #28] ("Gov't Notice to Decline Intervention").
[4] *See* Order (Feb. 10, 2022) [Dkt. #29].
[5] *See* Defs. Miguel A. Molinas, Diana Carubba, Ronaldo Factoriza, Francis Gumbel, Paul A. Lenz, and Javier A. Jover's Mot. to Dismiss Relator's Second Am. Compl. [Dkt. #68] ("Def. Physicians' MTD"); RehabCare MTD; SNF Defs.'s Mot. to Dismiss Second Am. Compl. [Dkt. #70] ("SNFs' MTD").
[6] *See* Minute Order (Mar. 30, 2023).

well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor." *Sissel v. U.S. Dep't of Health & Hum. Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). In addition to the complaint's factual allegations, the Court may consider "documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim." *Harris v. Amalgamated Transit Union Loc. 689*, 825 F. Supp. 2d 82, 85 (D.D.C. 2011).

Rule 9(b) requires the Relator to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The heightened pleading standard serves to "discourage[] the initiation of suits brought solely for their nuisance value," "safeguard[] potential defendants from frivolous accusations of moral turpitude," and "guarantee all defendants sufficient information to allow for preparation of a response." *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015) (quoting *United States ex rel. Williams v. Martin–Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)). Moreover, the False Claims Act is "self-evidently an anti-fraud statute, [and] complaints brought under it must comply with Rule 9(b)." *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002).

Rule 9(b) does not require a complaint "to contain a detailed allegation of all facts supporting each and every instance of submission of a false claim," *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 35 (D.D.C. 2003), but in order to satisfy Rule 9(b), a plaintiff must allege the "who," "what," "when," and

"where" with respect to the circumstances of an alleged fraud, *United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 76 (D.D.C. 2018).

## III. Analysis

RehabCare argues in its Motion to Dismiss that the Relator's SAC should be dismissed for four reasons: (1) the SAC fails to plead FCA liability as to RehabCare with the plausibility and particularity required by Rules 8(a) and 9(b); (2) the SAC fails to state an FCA conspiracy claim against RehabCare; (3) the FCA's public disclosure bar requires dismissal of the Relator's claims against RehabCare; and (4) the Relator released her FCA claims in her separation agreement. Because the Court finds that the FCA's public disclosure bar requires dismissal of the Relator's claims against RehabCare, it is not necessary to address the remaining arguments for dismissal.

RehabCare contends that the Relator's allegations in the instant case are copied from allegations about RUG upcoding which have already been brought by the Government against RehabCare in the *Halpin* Action and therefore that the FCA's public disclosure bar requires dismissal of the Relator's claims against RehabCare. *See* RehabCare MTD at 25–37. In response, the Relator argues that the SAC provides additional allegations of fraud that have not been publicly disclosed, and even assuming that there has been such a public disclosure, the Relator qualifies as an "original source" of the information and therefore the public disclosure bar does not apply. *See* Relator's Response to Def. RehabCare Group East, LLC's Mot. to Dismiss Relator's Second Am. Compl. at 22–30 ("Relator's Response to RehabCare's MTD") [Dkt. #74]. Unfortunately for the Relator, RehabCare has the stronger argument. How so?

The FCA's public disclosure bar was enacted to "walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994). The bar requires courts to dismiss actions "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . in a Federal . . . civil . . . hearing in which the Government or its agent is a party . . . ." 31 U.S.C. § 3730(e)(4)(A)(i). If the action is maintained by a relator, it can be rescued from the public disclosure bar if "the person bringing the action is an original source of the information." *Id.* § 3730(e)(4)(A). Although the FCA's public disclosure bar was once jurisdictional, as amended in 2010, it now "merely deprives the plaintiff of his claim." *Smith v. Athena Constr. Grp., Inc.*, No. 18-cv-2080 (APM), 2022 WL 888188, at *8 (D.D.C. Mar. 25, 2022) (quoting *United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 160 F. Supp. 3d 16, 24 (D.D.C. 2015) and collecting cases).

Therefore, a two-part test is established by the FCA for determining whether the public disclosure bar applies. *See Springfield*, 14 F.3d at 651; *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 681 (D.C. Cir. 1997). The court first must determine if the information underlying the allegations and transactions has been publicly disclosed. *See* 31 U.S.C. § 3730(e)(4)(A); *Springfield*, 14 F.3d at 651; *United States ex rel. Scutellaro v. Capitol Supply, Inc.*, No. 10-cv-1094 (BAH), 2017 WL 1422364, at *12 (D.D.C. Apr. 19, 2017). "If—and only if—the answer to the first question is affirmative, will the court then proceed to the original source inquiry." *Scutellaro*, 2017 WL 1422364, at *12 (quoting *Springfield*, 14 F.3d at 651).

### A. Public Disclosure

The Court finds that the allegations concerning RehabCare's RUG upcoding scheme were publicly disclosed in the *Halpin* Action filed in the District of Massachusetts. A suit is based upon publicly disclosed allegations or transactions when the allegations in the complaint are substantially similar to those in the public domain. *See United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 472 (D.C. Cir. 2016). The rule is intended to prevent suits brought by those other than an "original source" in situations "when the government already has enough information to investigate the case and to make a decision whether to prosecute or where the information could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." *Id.* (quoting *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012)). The public disclosure inquiry "focuses not on the additional incriminating information a relator supplies, but instead on whether 'the quantum of information already in the public sphere' was sufficient to 'set government investigators on the trail of fraud.'" *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 87 (D.C. Cir. 2014) (quoting *Springfield*, 14 F.3d at 654–55).

The Relator's allegations concerning RehabCare's RUG upcoding scheme are substantially similar to those in the *Halpin* Action. The United States' complaint in the *Halpin* Action alleged that RehabCare was liable under the FCA for "causing RehabCare's [SNF] customers across the United States to submit false claims to Medicare for therapy services that were unreasonable, unnecessary, or unskilled, or that simply did not occur as RehabCare reported them to have occurred." *Halpin* Action,

9

ECF No. 62, at 1. The Government's theory of liability in the *Halpin* Action rested on allegations that "RehabCare encouraged its Program Directors to plan an Ultra High RUG for each new SNF patient, regardless of clinical need for care at that level of intensity." *Id*. at ¶ 37. This is substantially similar to the Relator's allegations against RehabCare in the SAC: "RehabCare frequently claimed, without justification, to provide the highest and most-expensive levels of care in invoices billed to some of the Defendant Facilities," which resulted in the "Defendant Facilities . . . systematically inflat[ing] their Medicare and Medicaid payments by coding patients at higher RUG levels than warranted and continuing to apply higher RUG level treatment for longer than warranted." SAC ¶¶ 8, 156.

In fact, the Relator acknowledges in her SAC that the billing practices alleged in the SAC are "*substantially similar* to those . . . of other providers that have entered into settlement agreements with the DOJ for False Claims Act violations," and she cites the Department of Justice's announcement of the Government's settlement with RehabCare arising from the *Halpin* Action. SAC ¶ 155 & n.28 (emphasis added); *see also* U.S. Dep't of Just., *United States Recovers Over $133 Million for Fraudulent Nursing Home Therapy Claims* (Jan. 12, 2016), https://www.justice.gov/usao-ma/pr/united-states-recovers-over-133-million-fraudulent-nursing-home-therapy-claims [https://perma.cc/5L6W-9Z3T] ("The settlements with RehabCare and Wingate Healthcare arise from a lawsuit filed under the *qui tam,* or whistleblower, provisions of the False Claims Act. *See United States ex rel. Halpin and Fahey v. Kindred Healthcare, Inc.*, No. 11-12139-RGS (D. Mass.).").

As such, the *Halpin* Action constitutes a public disclosure as a federal civil hearing in which the Government or its agent is a party, and dismissal of the Relator's claims is warranted. *See* 31 U.S.C. § 3730(e)(4)(A)(i); *Springfield*, 14 F.3d at 651–52 (finding that information disclosed through civil litigation should be considered a public disclosure of allegations in a civil hearing for purposes of § 3730(e)(4)(A)).

The Relator's counterarguments are unpersuasive. She maintains that there have not been publicly disclosed instances of fraud at the Defendant Facilities named in this action. *See* Relator's Response to RehabCare's MTD at 22–23. However, the complaint in the *Halpin* Action involves allegations broader than the Relator's allegations concerning the Defendant Facilities in the SAC. The complaint in the *Halpin* Action alleges that RehabCare caused its "[SNF] customers *across the United States* to submit false claims to Medicare for therapy services . . . ." *Halpin* Action, ECF No. 62, at 1 (emphasis added). The Relator further argues that RehabCare's billing practices at the Defendant Facilities were not covered by the prior *Halpin* Action settlement because the settlement was limited to a timeframe that ended in September 2013, *see* SAC ¶ 198 & n.37, and the relevant time period for the Relator's allegations in the present case is from January 2009 through at least 2016, *see id.* at ¶ 3. But the Government's complaint in the *Halpin* Action alleges that RehabCare engaged in various fraudulent activities during the period between January 1, 2009 and September 30, 2013, *Halpin* Action, ECF No. 62, at 1, overlapping significantly with the Relator's allegations against RehabCare. Moreover, a complaint that "[m]erely provid[es] more specific details about" previously disclosed allegations or "specific instances of fraud where the general practice has already been

11

publicly disclosed" does not overcome the public disclosure bar. *Philip Morris*, 826 F.3d at 472 (internal quotation marks omitted). While the face of the *Halpin* Action complaint did not give the Government notice of the specific instances of fraud as it relates to the Defendant Facilities party to this action, the *Halpin* Action complaint did provide information "sufficient to 'set government investigators on the trail of fraud.'" *Staples*, 773 F.3d at 87 (quoting *Springfield*, 14 F.3d at 654–55). Therefore, the Court finds that the Relator's allegations as to RehabCare's RUG upcoding scheme have been publicly disclosed.

### B.  Original Source

The next step in the inquiry is to determine if the Relator served as an original source. Unfortunately for the Relator, she did not.

There are two ways for a relator to qualify as an original source. First, the relator could have "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" prior to the information being revealed to the public in one of the ways the statute recognizes as a public disclosure. *See* 31 U.S.C. § 3730(e)(4)(B). Alternatively, the relator must have "knowledge that is independent of and materially adds to the publicly disclosed allegations" and have "voluntarily provided the information to the Government before filing an action under this section." *Id.* Either avenue overcomes the public disclosure bar. *See Davis*, 679 F.3d at 839 n.4 (explaining that a relator can claim original source status by either meeting the pre-public disclosure requirement or by providing the information to the Government prior to the suit). And as the Relator has noted, and other courts in this District have previously held, the relator

has the burden to demonstrate that he or she is an original source. *See* Relator's Response to RehabCare's MTD at 23–24; *see also Smith*, 2022 WL 888188, at *9 ("The original-source inquiry therefore is framed as an exception to the public-disclosure affirmative defense. Placing the burden on the relator, who uniquely knows whether he is an original source, is therefore appropriate." (citation omitted)).

The Relator only argues that she qualifies as an original source under the second portion of the test, so the Court only needs to address whether or not the Relator had "knowledge that [was] independent of and materially add[ed] to the publicly disclosed allegations" and had "voluntarily provided the information to the Government before filing an action under [the FCA]." *See* 31 U.S.C. § 3730(e)(4)(B). The Relator argues that she is an original source because the additional information regarding RehabCare's Medicare fraud related to certain enumerated facilities not named in the settlement documents from the *Halpin* Action adds value for the Government. *See* Relator's Response to RehabCare's MTD at 24–25. But the Relator's allegations do not render her an original source. The Relator fails to qualify as an original source in two respects: first, the nonpublic information she allegedly disclosed does not materially add to the publicly disclosed information; and second, she fails to adequately allege that she voluntarily provided the information to the Government prior either to the public disclosure or before initiating this suit.

The Relator primarily relies on the information contained in the invoices sent by RehabCare to the Defendant Facilities to support her qualification as an original source. *See* Relator's Response to RehabCare's MTD at 24–25, 25 n.14. The information in the

invoices, disclosed in the form of provider summary reports and monthly facility data, allegedly details how certain Defendant Facilities participated in the RUG upcoding scheme. *See id.*; SAC ¶¶ 157–58. At best, the information provided by the Relator supports the claim that RehabCare continued the substantially similar, and already disclosed, fraud detailed in the *Halpin* Action and extended the same scheme to the Defendant Facilities. As a result, it cannot be a material addition to the publicly disclosed information. *See United States ex rel. O'Connor v. U.S. Cellular Corp.*, No. 20-cv-2071 (TSC), 2023 WL 2598678, at *6 (D.D.C. Mar. 22, 2023) (equating the substantial similarity and material addition standards); *see also Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 283 (7th Cir. 2016) (same).

Additionally, the Relator fails to adequately allege in the SAC that the information she claims supports her qualification as an original source was "voluntarily provided . . . to the Government *before* filing an action under [the FCA]." *See* 31 U.S.C. § 3730(e)(4)(B) (emphasis added). Indeed, she alleges that she "provided the government with a provider summary report (see Exhibit E) for several of the Defendant Facilities showing an inordinate amount of ultra-high therapy codes." SAC ¶ 158 (emphasis removed). However, she fails to adequately allege that the documents were provided to the Government prior to initiating this action. *See Smith*, 2022 WL 888188, at *10 (finding that the relator failed to represent that he provided the information to the Government prior to filing the action and therefore failed to carry his burden of establishing that he was an original source under the FCA).

14

Therefore, the Relator has failed to demonstrate that she meets the requirements for qualifying as an original source under the FCA, and the public disclosure bar requires dismissal of the Relator's claims against RehabCare.

**IV.   Conclusion**

For the foregoing reasons, RehabCare's Motion to Dismiss is hereby GRANTED. An order consistent with this decision accompanies this Memorandum Opinion.

_____
RICHARD J. LEON
United States District Judge