## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES & STATE OF TEXAS** | ) | |
| *ex rel.* **TERRI R. WINNON** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 17-2433 (RJL)** |
| | ) | |
| **RAMIRO LOZANO,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION
(September *15*, 2023) [Dkt. #70]

Relator Terri R. Winnon ("Winnon" or "Relator") brought suit on behalf of the

United States and the State of Texas under the *qui tam* provisions of the False Claims

Act, 31 U.S.C. § 3729, *et seq.* ("False Claims Act" or "FCA"), and the Texas Medicaid

Fraud Prevention Law, TEX. HUM. RES. CODE ANN. § 36.011, *et seq.* ("TMFPL").

Relator's Second Am. Compl. ("SAC") [Dkt. #23] ¶ 1.  The Relator alleges that the

defendants knowingly submitted, or caused to be submitted, false claims to government

health care programs, including Medicare and the Texas Medicaid program, and

knowingly offered, paid, solicited, and/or accepted remunerations in exchange for

medical referrals in violation of federal and state laws.  *Id.* at ¶ 2.  The action is brought

against seventeen defendants who have been organized into three groups, and each of the

three groups of defendants has filed a separate Motion to Dismiss.  This memorandum

discusses the Motion to Dismiss brought by eight Skilled Nursing Facility ("SNF")

1

entities ("Defendant Facilities")[1] and individuals Ramiro Lozano ("Lozano") and Jay W. Balentine ("Balentine") (collectively, the "SNF Defendants").[2]  For the following reasons, the SNF Defendants' Motion to Dismiss is GRANTED.[3]

## I.   Background

### a.   Factual Background

The Relator was the Executive Assistant and later Controller for Lozano who, along with Balentine, owned, controlled, and operated a number of health care facilities throughout Texas from January 2009 through at least 2016.  *See* SAC ¶¶ 3, 12.  In particular, Lozano and/or Balentine owned, controlled, and/or operated the eight[4] Defendant Facilities.  *Id*. at ¶ 3.  The Defendant Facilities were enrolled as Medicare and Texas Medicaid providers during the relevant time period.  *Id*.

After a period of time working for Lozano, the Relator began to notice anomalies with the companies' finances and became concerned about certain practices by Lozano, Balentine, and the Defendant Facilities.  *Id*. at ¶ 11.  After raising such concerns to

---

[1] The eight SNF entities include: RJ Meridian Care Alta Vista, LLC; RJ Meridian Care of Alice, LTD ("Alice Facility"); RJ Meridian Care of Galveston, LLC; RJ Meridian Care of Hebbronville, LTD; RJ Meridian Care of San Antonio, LTD; RJ Meridian Care of San Antonio III, LLC; Spanish Meadows of Katy, LTD ("Katy Facility"); and Empire Spanish Meadows, LTD.

[2] *See* Mem. in Supp. of SNF Defs.' Mot. to Dismiss Second Am. Compl. ("SNF Defs.' MTD") [Dkt. #70]; Relator's Resp. to the SNF Defs.' Mot. to Dismiss Relator's Second Am. Compl. (Relator's Resp. to SNF Defs.' MTD") [Dkt. #73]; SNF Defs.' Reply in Support of Their Mot. to Dismiss Second Am. Compl. ("SNF Defs.' Reply") [Dkt. #78].  The other two groups of defendants are: first, a group of six physicians—Miguel A. Molinas, Diana Carubba, Ronaldo Factoriza, Francis Gumbel, Paul A. Lenz, and Javier A. Jover (collectively, the "Defendant Physicians"); and second, RehabCare Group East, LLC ("RehabCare").

[3] The Court declines to exercise supplemental (or "pendant") jurisdiction over the remaining state law claims.  *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (explaining that when all federal claims are eliminated before trial, courts may "declin[e] to exercise jurisdiction over the remaining state-law claims"); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1267 (D.C. Cir. 1995).

[4] According to the SNF Defendants, three of the facilities are owned by other entities with Lozano as their registered agent: RJ Meridian Care of San Antonio III, LLC; Spanish Meadows of Katy, LTD; and Empire Spanish Meadows, LTD.  *See* SNF Defs.' MTD at 2.

Lozano over a period of time, she was terminated. *Id*. The Relator brought three sets of allegations against the SNF Defendants.

### i. *Remuneration Allegations*

In her first set of allegations, the Relator alleges that the SNF Defendants violated the FCA and the TMFPL by providing illegal remuneration to physicians and discharge planners in exchange for referrals to the Defendant Facilities. *See* SAC ¶ 5. In particular, she alleges that the SNF Defendants provided illegal remuneration through two forms: first, she alleges that the SNF Defendants paid certain physicians, including the six Defendant Physicians, as medical directors in an effort to illegally induce patient referrals to the Defendant Facilities, *id*. at ¶¶ 96–99; and second, she alleges that one of the Defendant Facilities, Empire Spanish Meadows, provided remunerations (in the form of, among other things, alcohol and meals) to discharge planners and doctors, including the six Defendant Physicians, as evidenced by Empire Spanish Meadows' own account records, *id*. at ¶¶ 108–09.

### ii. *RUG Upcoding Allegations*

Medicare Part A reimbursement to SNFs covers medically necessary inpatient therapy services provided during a Medicare beneficiary's covered SNF stay. *See* 42 U.S.C. § 1395y(a)(1)(A). During most of the period between 2009 and 2016, SNFs were paid under Medicare Part A for skilled nursing services and therapy services under a prospective payment system according to the calculated daily payment rates. *See* SAC ¶ 127. Under this system, SNFs classified each beneficiary who received skilled nursing services at their facilities into a particular group, known as a resource utilization group, or

"RUG," based on the patient's care and resource needs. *See id.* The RUG classification was then used to determine the daily payment rate for each patient beneficiary in the SNF. *See id.* at ¶ 128. Under the RUG classification system—the "RUG-IV System"—there were 66 different payment coding levels for SNF patients, which were divided into several categories, including categories related to therapy. *Id.* at ¶ 130. Under the RUG-IV System, there were five levels of therapy services: (1) Ultra High, which required a minimum of 720 minutes of therapy per week in at least two therapy disciplines; (2) Very High, which required between 500 and 719 minutes of therapy per week; (3) High, which required between 325 and 499 minutes of therapy per week; (4) Medium, which required between 150 and 324 minutes of therapy per week; and (5) Low, which required between 45 and 149 minutes of therapy per week. *Id.* at ¶ 132.

In her second set of allegations, the Relator alleges that the SNF Defendants overcharged for skilled nursing services by falsely claiming higher daily rates for such services than were justified. *See id.* at ¶¶ 7, 123. Specifically, she alleges that the Defendant Facilities "repeatedly and systematically assigned higher [RUG levels] to patient beneficiaries for whom the higher level of care was not medically justified." *Id.* at ¶ 123. She also alleges that the Defendant Facilities assigned those higher RUG levels to patient beneficiaries for a longer period of time than was medically justified based on the patients' needs. *See id.* As a result, the Relator claims the SNF Defendants received more taxpayer funds than they were lawfully entitled to receive. *See id.* at ¶ 124.

She alleges that, for example, the Katy Facility had an 81.8% Ultra-High therapy billing rate in 2014, which put it within the top 1% of Ultra-High therapy billing SNFs in

4

the entire country. *See id*. at ¶¶ 159–60.  She therefore asserts that the Katy Facility's

billing rates "represent a gross outlier" compared to other similar facilities nationwide.

*See id*. at ¶ 162.  The Relator also claims that in 2014, the Katy Facility subjected patients

to a disproportionately high number of days of Ultra-High therapy, an average of 42.9

days compared to the national average of 23.9 days. *See id.* at ¶ 163.  According to the

Relator, the Alice Facility similarly submitted false and unsubstantiated RUG claims.

*See id.* at ¶¶ 175–79.  To support her allegations, the Relator points to internal invoices

for three specific patients and alleges that the number of days that those patients were

billed out as receiving "Very High" or "Ultra High" therapy alone suggests a pattern of

overbilling. *See id.* at ¶¶ 188–90.

     *iii.  Cost Report Allegations*

In her third and final set of allegations, the Relator claims that the Medicare cost

reports[5] submitted annually by the Defendant Facilities contained false information.  The

report contains "provider information such as facility characteristics, utilization data, cost

and charges by cost center (in total and for Medicare), Medicare settlement data, and

financial statement data."  SAC ¶ 200 (quoting CMS, Cost Reports,

https://www.cms.gov/Research-Statistics-Data-and-Systems/Downloadable-Public-Use-

Files/Cost-Reports [https://perma.cc/KBU5-87B5]).  Specifically, wage index

information, overhead costs, wage related costs, and direct care expenditures are required

to be reported by SNFs. *See id*. (citing CMS, Medicare Provider Reimbursement Manual

---

[5] Also known as Form 2540-10 (formerly Form 2540-96).

(Aug. 19, 2016), https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R7PR241.pdf [https://perma.cc/U9UJ-PKWJ]).

The Relator alleges that because kickbacks were paid to referral sources, the relevant Medicare cost reports contained "*per se* material misrepresentations or omissions." *Id*. Specifically, the Relator alleges that the reports submitted by the SNFs included improper expenses associated with two airplanes and a yacht owned by Lozano and/or Balentine—including labor costs for services rendered on the yacht and costs to pay an airplane pilot—and not for work associated with the health care facilities. *See id*. at ¶¶ 200–07. The Relator alleges that she "believes that similar practices across the Defendant Facilities caused the submission of numerous cost reports that contained false information, inflated costs, and unallowable expenses." *Id*. at ¶ 207.

b. Procedural Background

Winnon filed this action in November 2017, asserting claims for violations of the FCA and the TMFPL. *See* SAC. The United States sought and received from the Court several extensions of time to conduct its own investigation of the facts and to consider whether it would intervene. In February 2022, the United States and the State of Texas noticed their election to decline intervention,[6] and shortly thereafter the Court unsealed relevant portions of the record and directed for the Complaint to be served upon all defendants. *See* Order (Feb. 10, 2022) [Dkt. #29]. In July 2022, the three groups of

---

[6] *See* Notice of Election to Decline Intervention by United States of America [Dkt. #28].

defendants filed separate Motions to Dismiss.[7]  In March 2023, the Court granted the

Defendants' Motion to Stay Discovery.[8]

## II.    LEGAL STANDARD

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint."  *Browning v.*

*Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  To survive a motion to dismiss, a complaint

"must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the

allegations contained in the complaint allow the Court to "draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Id*.  Although the standard does

not amount to a "probability requirement," it does require "more than a sheer possibility

that a defendant has acted unlawfully."  *Id*.  "Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements," are not sufficient to state a

claim.  *Id*.  When resolving a Rule 12(b)(6) motion, the Court "assumes the truth of all

well-pleaded factual allegations in the complaint and construes reasonable inferences

from those allegations in the plaintiff's favor."  *Sissel v. U.S. Dep't of Health & Hum.*

*Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014).  In addition to the complaint's factual allegations,

the Court may consider "documents attached to or incorporated in the complaint, matters

of which courts may take judicial notice, and documents appended to a motion to dismiss

---

[7] Def. Miguel A. Molinas, Diana Carubba, Ronaldo Factoriza, Francis Gumbel, Paul A. Lenz, and Javier A. Jover's Mot. to Dismiss Relator's Second Am. Compl. [Dkt. #68]; Def. RehabCare Group East, LLC's Mot. to Dismiss Relator's Second Am. Compl. [Dkt. #69]; SNF Defs.' MTD.

[8] *See* Minute Order (Mar. 30, 2023).

whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim." *Harris v. Amalgamated Transit Union Loc. 689*, 825 F. Supp. 2d 82, 85 (D.D.C. 2011).

Rule 9(b) requires a relator to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The heightened pleading standard serves to "discourage[] the initiation of suits brought solely for their nuisance value," "safeguard[] potential defendants from frivolous accusations of moral turpitude," and "guarantee all defendants sufficient information to allow for preparation of a response." *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015) (quoting *United States ex rel. Williams v. Martin–Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)). Moreover, the False Claims Act is "self-evidently an anti-fraud statute, [and] complaints brought under it must comply with Rule 9(b)." *United States ex rel. Totten v. Bombardier Corp.,* 286 F.3d 542, 551–52 (D.C. Cir. 2002).

Rule 9(b) does not require a complaint that covers a multi-year period "to contain a detailed allegation of all facts supporting each and every instance of submission of a false claim," *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 35 (D.D.C. 2003), but in order to satisfy Rule 9(b), a plaintiff must allege the "who," "what," "when," and "where" with respect to the circumstances of an alleged fraud, *United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 76 (D.D.C. 2018).

### III.    ANALYSIS

The SNF Defendants argue, *inter alia*, that the Relator's remuneration, RUG upcoding, and cost report claims should be dismissed pursuant to Rule 12(b)(6) and Rule 9(b).  *See* SNF Defs.' MTD at 18–35.  The Relator argues that the SAC adequately pleads the claims.  *See* Relator's Resp. to SNF Defs.' MTD at 5–23.  Unfortunately for the Relator, the SNF Defendants have the better argument.[9]  How so?

The three sets of allegations are addressed in turn below.

### a.    Remuneration Allegations

The SNF Defendants argue that the Relator's remuneration claims should be dismissed because she fails to sufficiently plead predicate violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Physician Self-Referral Law (or "Stark Law"), 42 U.S.C. § 1395nn, fails to identify tainted referrals, and does not identify any false claims or submissions tied to specific tainted referrals.  *See* SNF Defs.' MTD at 19.  The Court ultimately reaches the same conclusion as it did with respect to the remuneration allegations against the Physician Defendants, *see* Memorandum Opinion [Dkt. #94], which is that the Relator failed to plead fraud with particularly to the standard required by Rule 9(b).

The Relator contends that the Defendant Physicians illegally referred patients to the Defendant Facilities in exchange for "sham" medical directorships and other

---

[9] The Relator also brought a claim for conspiracy violate the FCA.  *See* SAC ¶¶ 223–25.  However, because the Court determines that the Relator failed to adequately plead the underlying violations of the FCA, the Court can dispose of the conspiracy count in short order.  *See Pencheng Si*, 71 F. Supp. 3d at 98 ("[T]here can be no conspiracy to commit fraud in violation of the FCA if an underlying false claim has not been adequately alleged").

remunerations from Empire Spanish Meadows in the form of meals, alcohol, and other gifts. *See* SAC ¶¶ 93–118. According to the Relator, she does not recall ever seeing a written agreement between the facilities and a "medical director," and the medical directors were paid a static monthly rate. *See id*. at ¶¶ 98–99. The Relator alleges such a static payment rate from month-to-month is suspicious because it does not account for the amount of work the physicians performed in a particular month. *See id*. The Relator also alleges that Empire Spanish Meadows, one of the Defendant Facilities, provided remunerations to discharge planners and doctors, including the Defendant Physicians, as evidenced by examples from Empire Spanish Meadows' own account records from 2013 to 2015. *See id*. at ¶¶ 109–10.

Although the Relator adequately alleges the "who," "where," and "when" requirements of Rule 9(b) by identifying the individuals and corporate entities who allegedly participated in the purported scheme,[10] the locations at which the scheme allegedly occurred,[11] and the relevant time period,[12] the "what" element is not alleged sufficiently because she fails to provide a "detailed identification" of the allegedly fraudulent scheme. *See Riedel*, 332 F. Supp. 3d at 78 (quoting *Heath*, 791 F.3d at 124). Instead, a careful reading of the SAC reveals only conclusory allegations of the alleged scheme to provide unlawful remunerations and kickbacks to the Defendant Physicians in return for unlawful referrals. *See* SAC ¶¶ 93–118. Although Rule 9(b) does not require the Relator to "identify particular claims resulting from the kickback scheme," the

---

[10] *See* SAC ¶¶ 8–11.
[11] *Id*. at ¶¶ 3, 97–109.
[12] *Id*. at ¶ 3.

Relator fails to "fully explain how the alleged scheme concerning these physicians is supposed to work." *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 665, 674 (S.D. Tex. 2013).  Relator Winnon's allegations against the SNF Defendants are therefore insufficient to satisfy Rule 9(b)'s particularity standard.

Unlike in *United States ex rel. Thomas v. St. Joseph Hospice, LLC*, No. 2:16-cv-143, 2019 WL 1271019 (S.D. Miss. Mar. 19, 2019), a case involving similar allegations of allegedly fraudulent medical directorships, Relator Winnon did not plead "substantial details of the alleged agreement." *Id*. at *1, *10.  In *Thomas*, the relators made the following specific allegations against the defendants, providers of hospice services: defendants paid their medical directors varying rates based on the volume and value of each physician's referrals; defendants' employees made up fake time entries and compensation sheets that did not correspond to the actual amount of time the medical directors worked; defendants reduced a medical director's pay when the medical director stopped bringing in referrals; and relators identified specific patients referred to the defendants by specific medical directors in exchange for remuneration as well as the specific dates the patients were admitted. *Id*. at *10.  Not surprisingly, the court in *Thomas* held that such allegations are "reliable indications of fraud" and the relators had pleaded "a level of detail that demonstrates that an alleged scheme likely resulted in bills submitted for government payment." *Id*. (quoting *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 529 F. App'x 890, 893 (5th Cir. 2013)).  In the instant case, Relator Winnon's allegations against the SNF Defendants fall far short of the level of specificity pleaded by the relators in *Thomas*.

Relator Winnon's allegations are also unlike the plaintiffs' allegations in *United States ex rel. Kaczmarcyk v. SCCI Health Servs. Corp.*, Civ. No. H-99-1031, 2004 WL 7089810 (S.D. Tex. Mar. 11, 2004).  Although the defendant in *Kaczmarcyk*, a hospital, alleged that the United States' complaint failed to meet Rule 9(b)'s requirements, the court found that the complaint provided sufficient detail of the alleged scheme.  *Id*. at *4– 7.  In that case, the complaint alleged that the medical directorship agreements were shams because the compensation provided "was, in reality, both a reward for the volume of past referrals and an incentive to continue a high number of referrals," and the complaint further noted that three of the physicians hired as medical directors admitted nearly fifty percent of the defendant hospital's patients during a specified time period.  *Id*. at *4–5.  The court noted that the Government's complaint also explained why the medical directorships did not fit within the personal service arrangements exception to the Stark Law because the defendant hired more medical directors than were reasonable and necessary, compensated the medical directors at a rate exceeding fair market value for the services they were expected to perform, and took into account past and future referrals in setting the contract rates.  *Id*. at *5.  By comparison, Relator Winnon's allegations against the SNF Defendants provide far less detail about the alleged medical directorships scheme.

Rather, Relator Winnon's allegations are more akin to the original complaint dismissed by the court in *United States ex rel. Emanuele v. Medicor Assocs.*, No. 10-cv-245, 2013 WL 3893323 (W.D. Pa. July 26, 2013).  In *Emanuele*, the court found that the relator's original complaint had failed to meet the Rule 9(b) pleading requirement

because it "[did] not delineate why the medical directorships at issue were not legitimate service contracts, what instructions concerning the service contracts were allegedly given, and whether any specific or even general number of referrals allegedly took place pursuant to the contracts." *Id.* at *8.  Ultimately, the court in *Emanuele* held that the allegations contained in the original complaint were "conclusory and nonspecific" and dismissed the claims.  *Id.*

The Relator's claims here fail to provide "detailed identification" of the allegedly fraudulent remuneration scheme, *Riedel*, 332 F. Supp. 3d at 78 (quoting *Heath*, 791 F.3d at 124), which "fully explain[s] how the alleged scheme concerning these physicians is supposed to work," *Parikh*, 977 F. Supp. 2d at 674, as is required by Rule 9(b).

b.  <u>RUG Upcoding Allegations</u>

The SNF Defendants argue that the Relator's use of statistical data regarding RUG billing codes fails to meet the heightened pleading requirements of Rule 9(b).  The Court finds that the Relator's reliance on the comparison of statistical averages of Ultra-High RUG codes between the Defendant Facilities and other SNFs nationwide, without also pleading "particular details of a scheme to submit false claims," does not meet the particularity requirements of Rule 9(b).  *See Heath*, 791 F.3d. at 126 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

The Relator claims that the Defendant Facilities overcharged for skilled nursing services by assigning higher payment rates and applying them for longer periods of time than were medically justified.  *See* SAC ¶ 123.  The Relator relies on comparisons of rates and days that Defendant Facilities billed for Ultra-High RUG codes with those of

SNFs nationwide.  For example, the Relator points out that the Katy Facility billed 81.8%

of the total patient days at the facility in 2014 at Ultra-High rug codes, compared to the

SNF nationwide average of 39% according to a 2010 OIG Report.  *Id*. at ¶¶ 159–60.  The

Relator also notes that among all SNFs nationwide that provided Ultra-High therapy in

2014, the average number of days of Ultra-High therapy for each patient that received

such therapy was 23.9 days, whereas at the Katy Facility, the average number of days of

Ultra-High therapy was 42.9 days.  *Id*. at ¶ 163.  The Relator concludes that because

Defendant Facilities billed for Ultra-High RUG codes at higher rates and for longer

periods of time than the nationwide averages, the therapy services provided were

medically unnecessary and resulted in the submission of false claims.  *Id*. at ¶¶ 123–24,

156.

However, under Rule 9(b), reliance on statistical or mathematical probabilities

*alone* does not meet the heightened particularity requirements.  *See United States ex. rel.*

*Integra Med. Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892, 900

(5th Cir. 2020) (finding that relator's allegation that defendant's patients were placed on

mechanical ventilation "over twice the national average" did not "withstand the

heightened pleading requirements for fraud under Rule 9(b)"); *see also Est. of Helmly v.*

*Bethany Hospice & Palliative Care of Coastal Ga., LLC*, 853 F. App'x 496, 502–03

(11th Cir. 2021) (concluding that "numerical probability is not an indicium of reliability"

that defendants submitted a false claim); *Carrel v. AIDS Healthcare Found.*, 898 F.3d

1267, 1277 (11th Cir. 2018) (finding that relators cannot "rely on mathematical

probability to conclude that the [defendant] surely must have submitted a false claim at some point").[13]

Instead, relators must plead "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Heath*, 791 F.3d. at 126 (quoting *Grubbs*, 565 F.3d at 190). Here, the Relator's allegations plead far fewer details of a scheme to submit false claims compared to other similar cases involving fraud schemes. For example, in *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1 (D.D.C. 2003),[14] the Government brought an action against a neurologist and his neurology clinic and alleged a complex fraud scheme involving the upcoding of certain medical services. *Id.* at 1, 4. The Government's allegations provided details about the fraudulent scheme and described the methodology the defendants used to inflate the code above the actual level of service provided. *Id.* at 3–4. Specifically, the Government alleged that defendants provided physicians with fee tickets pre-printed for higher codes, regardless of the actual services provided. *Id.* The Government provided statistical averages of the percentage of claims at high levels, but also pointed to 12 sample patient cases and analyzed the differences between the code documented with the actual services and treatment provided. *Id.* The Court ultimately

---

[13] The Court does not read the cases the Relator cites regarding the use of statistical sampling as an endorsement that the comparison of raw statistical data is sufficient to meet Rule 9(b) particularity standards, as the two are very different mathematical methodologies. *See* Relator's Resp. to SNF Defs.' MTD at 17–18; *United States v. Life Care Ctrs. of Am., Inc.*, 114 F. Supp. 3d 549, 570–72 (E.D. Tenn. 2014) (holding that statistical sampling and extrapolation may be used to establish FCA liability); *United States v. Fadul*, No. 11-cv-0385, 2013 WL 781614, at *14 (D. Md. Feb. 28, 2013) (endorsing statistical sampling and extrapolation as a method to calculate damages).

[14] Cited in Relator's Resp. to SNF Defs.' MTD at 16–17.

concluded that such allegations provided an "adequate factual basis for [the Government's] allegations of fraud under Rule 9(b)." *Id*. at 9.

Similarly, in *Grubbs*, a doctor brought a *qui tam* action alleging that a hospital and other doctors participated in a fraud scheme to bill patient visits by nurses on the weekend as physician treatments. 565 F.3d at 184. The Fifth Circuit found that the relator in *Grubbs* alleged "particular details of a scheme to submit false claims" by providing specific details of the scheme, such as "the date, place, and participants [of a] dinner meeting at which two doctors in his section attempted to bring him into the fold of their [fraudulent scheme]" and first-hand accounts of how certain nursing staff attempted to assist him in recording physician visits that had not occurred. *Id*. at 191–92.

In contrast, the Relator's allegations fall short of the particularity provided by the relators in *Grubbs* and *Harris*. The Relator's RUG upcoding allegations rely primarily on a comparison of certain Defendant Facilities' rates of billing for Ultra-High RUG codes and average number of days of Ultra-High therapy to averages for SNFs nationwide, *see* SAC ¶¶ 159–99, but fail to provide "particular details of a scheme to submit false claims," *Grubbs*, 565 F.3d at 190, such as "how [the fraud scheme] was implemented, and the . . . materials used," *Heath*, 791 F.3d. at 126.

Further, the complaint must be "particular enough to 'guarantee all defendants sufficient information to allow for preparation of a response.'" *Heath,* 791 F.3d at 123 (quoting *United States ex rel. Williams v. Martin–Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)). The Fifth Circuit in *Grubbs* found that "[c]onfronting False Claims Act defendants with both an alleged scheme to submit false claims and details

leading to a strong inference that those claims were submitted . . . gives defendants adequate notice of the claims.  In many cases, the defendants will be in possession of the most relevant records, such as patients' charts, doctors' notes, and internal billing records, with which to defend on the grounds that alleged falsely-recorded services were not recorded, were not billed for, or were actually provided."  *Grubbs*, 565 F.3d at 190–91.  As the SNF Defendants point out, statistical averages, by definition, do not provide information about specific patients or specific claims, *see* SNF Defs.' MTD at 29, nor do statistics provide particular details of a fraudulent scheme, which makes it difficult for the defendants to respond appropriately.  A lack of particularity prevents the SNF Defendants from, for example, justifying the medical necessity of higher RUG codes for particular patients on certain dates.  *Id.*  Indeed, the Relator's failure to make allegations which satisfy the particularity requirements of Rule 9(b) inhibits the SNF Defendants' ability to prepare an adequate response.

The Relator's attempts at providing patient-specific information, however, fail to elevate her claims to meet the Rule 9(b) particularity threshold.  While the Relator points to individual patients and the number of days of "Very High" and "Ultra High" therapy the patients received, she fails to make claims to suggest that such therapy was medically unnecessary *for those patients*.  For example, the Relator alleges that internal invoices indicate Patient R.L. received 86 straight days of "Very High" or "Ultra High" therapy at the Alice Facility in early 2015 but she does not allege that Patient R.L. did not have a legitimate medical need for such therapy.  SAC ¶ 188.  Providing identifying patient information without indication about what makes it a false claim is conclusory and does

not meet the Rule 9(b) particularity standard either.  *See Baylor Scott & White Health*, 816 F. App'x at 898 ("[Relator's] examples simply give some identifying patient information and pair it with a diagnosis.  No example gives any indication about what makes it a false claim.  The claims of falsity are simply conclusory.").  While the Relator is not required to plead the precise details of individual claims, *see Heath*, 791 F.3d. at 126, the allegations concerning specific patients the Relator does provide do not help her cross the particularity threshold of Rule 9(b).

The statistics the Relator cites do raise eyebrows, but such statistics absent "particular details of a scheme to submit false claims" fail to meet the particularity requirements of Rule 9(b).

      c.  Cost Report Allegations

The SNF Defendants argue that the Relator's cost report allegations fail to meet Rule 9(b)'s particularity requirements.  The Court finds that the Relator falls far short of meeting Rule 9(b)'s requirements because she fails to allege with particularity that any Medicare cost reports with erroneous or improper costs were actually submitted to the Government, and she further fails to provide specific factual allegations regarding the source and nature of any alleged repayment obligation that was implicated by the allegedly false cost reports.

The Relator alleges that the SNF Defendants submitted Medicare cost reports that included costs associated with two airplanes and a yacht owned by Lozano and/or Balentine.  *See* SAC ¶¶ 200–07.  For example, the Relator alleges that based on her recollection and internal documentation, a significant amount of money paid to certain

individuals by the SNF Defendants was for services rendered on a yacht and not for maintenance work associated with health care facilities.  *Id*. at ¶ 202.  The Relator further alleges that she "believes" these costs were submitted in Medicare cost reports to the Government.  *Id*. at ¶ 203.  As a second example, the Relator alleges that she exchanged emails with Lozano questioning the wages at some of the Defendant Facilities, which included expenses that were in fact wages for an airplane pilot.  *Id*. at ¶¶ 205–06.  The Relator again alleges that she "believes" these expenses would have been included in cost reports submitted to the Government.  *Id*. at ¶ 206.

The Relator alleges that such actions violated Section 3729(a)(1)(G) of the FCA by making what is commonly known as a "reverse" false claim.  *See* SAC ¶¶ 200–07, 226–29.  Section 3729(a)(1)(G) imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  "[A] typical false claim action involves a defendant knowingly making a false statement in order to avoid having to pay the government when payment is otherwise due."  *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 88 (D.D.C. 2014).

However, the Relator fails to provide even conclusory, but specific, factual allegations about the alleged repayment obligation.  *See id. at* 96–97 ("In addition to failing to provide any details about the source of the alleged obligation, the Relator also fails to specify the *parameters* of that obligation, such as what triggers the duty to repay

and what sort of repayment it requires.  Because the amended complaint provides none of this information, it is plainly insufficient.").  The Relator fails to provide any specific allegations to establish that the SNF Defendants had a duty to repay in connection with the reported costs and also fails to explain, for example, "what triggers the duty to repay and what sort of repayment it requires." *See id.* at 96.

At best, the Relator merely claims that "CMS requires providers to submit accurate cost reporting information, which is material to CMS's administration of the Medicare program" and that "there is evidence that Lozano tried to conceal the nature of some of his financial transactions."  SAC ¶¶ 204, 207.  However, courts in this District have determined that a "reverse false claim may not rest . . . on the argument 'that an obligation arose out of [the d]efendants' concealment of their allegedly fraudulent activity,' because 'by this logic, just about any traditional false statement or presentment action would give rise to a reverse false claim action; after all, presumably any false statement actionable under sections 3729(a)(1)(A) or 3729(a)(1)(B) could theoretically trigger an obligation to repay the fraudulently obtained money.'" *Riedel*, 332 F. Supp. 3d at 82–83) (quoting *United States ex rel. Groat v. Bos. Heart Diagnostics Corp.*, 255 F. Supp. 3d 13, 32 (D.D.C. 2017), *amended on reconsideration in part*, 296 F. Supp. 3d 155 (D.D.C. 2017)); *see also United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, No. 15-cv-750, 2020 WL 686009, at *28 (D.D.C. Feb. 11, 2020); *United States ex rel. Scollick v. Narula*, 215 F. Supp. 3d 26, 41 (D.D.C. 2016); *Pengcheng Si*, 71 F. Supp. 3d at 97.

As such, the Relator's cost report allegations fall woefully short of meeting Rule 9(b)'s particularity requirements.

**IV.   CONCLUSION**

For the foregoing reasons, the SNF Defendants' Motion to Dismiss is hereby GRANTED.  An order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge